# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| IN RE BGC PARTNERS, INC. DERIVATIVE LITIGATION | ) CONSOLIDATED<br>) C.A. No. 2018-0722-LWW |

## MEMORANDUM OPINION

Date Submitted: June 22, 2021
Date Decided: September 20, 2021

Christine M. Mackintosh, Kimberly A. Evans, Michael D. Bell, and Vivek Upadhya, GRANT & EISENHOFER P.A., Wilmington, Delaware; Jeroen van Kwawegen, Christopher J. Orrico, and Andrew E. Blumberg, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; *Counsel for Plaintiffs Roofers Local 149 Pension Fund and Northern California Pipe Trades Trust Funds*

Raymond J. DiCamillo and Kevin M. Gallagher, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Joseph De Simone, Michelle J. Annunziata, and Michael Rayfield, MAYER BROWN LLP, New York, New York; Matthew E. Fenn, MAYER BROWN LLP, Chicago, Illinois; *Counsel for Defendants Linda Bell, Stephen Curwood, and William Moran*

C. Barr Flinn, Paul Loughman, and Alberto E. Chávez, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Eric Leon and Nathan Taylor, LATHAM & WATKINS LLP, New York, New York; *Counsel for Defendants Howard Lutnick, CF Group Management, Inc., and Cantor Fitzgerald, L.P.*

**WILL, Vice Chancellor**

This derivative action arises from the 2017 acquisition of Berkeley Point Financial LLC by BGC Partners, Inc. BGC paid $875 million to purchase Berkeley Point from Cantor Commercial Real Estate Company, L.P. ("CCRE") and simultaneously invested $100 million into CCRE's commercial mortgage-backed securities business. Defendant Howard Lutnick, BGC's Chairman and CEO, was the controlling stockholder of both BGC and CCRE through his control of defendant Cantor Fitzgerald, L.P.

The plaintiffs claim that Lutnick, standing on both sides of the transaction, caused BGC to overpay for Berkeley Point because his economic interest in Berkeley Point far exceeded his interest in BGC. They estimate that Lutnick received 42% (or $125 million) of BGC's overpayment. The plaintiffs assert breach of fiduciary duty claims against Lutnick as a director, controlling stockholder, and officer of BGC; against two Cantor entities that sat above BGC and Berkeley Point; and against four outside BGC directors (one of whom was dropped from the case) who approved the Berkley Point acquisition.

The court previously denied the defendants' motions to dismiss for failure to plead demand futility and failure to state a claim against the outside directors. Now, after discovery, the defendants have filed separate motions for summary judgment. Lutnick and the two Cantor entities argue that there is no genuine issue of material fact as to the independence of the outside director defendants, requiring dismissal on

1

demand futility grounds.  If their motion is denied on that basis, they seek to shift the burden of persuasion at trial to the plaintiffs.  The director defendants—members of the Special Committee who negotiated on BGC's behalf—argue that they must be dismissed under *Cornerstone* because there is no evidence that they acted to advance the self-interests of Lutnick or acted in bad faith.

After a review of the record before me, I conclude that the Cantor defendants' motion must be denied and the director defendants' motion must be granted, in part. There is a genuine dispute about whether two of the three director defendants were independent of Lutnick.  For one of those directors, there are genuine issues of material fact remaining as to whether he faces a non-exculpated claim.  The evidence is not overwhelming.  But that is not the standard.  The plaintiffs are entitled to inferences favoring their position and have pointed to questions of fact that are best left for trial.  For the two remaining director defendants, I conclude that no rational trier of fact could find both that they lack independence from Lutnick and that they acted to advance Lutnick's interests.  I also conclude that the burden of proving entire fairness at trial remains with the defendants.

# I.      FACTUAL BACKGROUND

The following summary is drawn from the Complaint for uncontested background facts and from the factual record as appropriate.[1] The defendants' briefs each style their fact sections as a "Statement of Undisputed Material Facts."[2] The plaintiffs refute that title, calling the defendants' descriptions of the facts "distorted."[3] The plaintiffs submitted a "Disputed Fact Chart,"[4] to which the defendants responded on reply.[5] I therefore approach the notion of undisputed facts with caution. In considering the record, my focus is on information that bears on the director defendants' relationships to Lutnick and their negotiation efforts as Special Committee members.

---

[1] Citations in the form "Dir. Defs.' Opening Br. Ex. __" refer to exhibits to the Transmittal Declaration of Kevin M. Gallagher in Support of the Independent Director Defendants' Opening Brief in Support of Their Motion for Summary Judgment (Dkt. 164). Citations in the form "Pls.' Answering Br. Ex. __" refer to exhibits to the Unsworn Transmittal Affidavit of Christine M. Mackintosh in Support of Plaintiffs' Omnibus Answering Brief (Dkt. 180). Citations in the form "Dir. Defs.' Reply Br. Ex. __" refer to exhibits to the Transmittal Declaration of Kevin M. Gallagher in Support of the Independent Director Defendants' Reply Brief in Support of Their Motion for Summary Judgment (Dkt. 195). Page numbers to exhibits are designated by the last four digits of a Bates number, where appropriate.

[2] Dir. Defs.' Opening Br. 7 (Dkt. 163); Cantor Defs.' Opening Br. 4 (Dkt. 172).

[3] Pls.' Answering Br. 8 (Dkt. 180).

[4] *Id.*; Pls.' Answering Br. Ex. 2.

[5] Dir. Defs.' Reply Br. Ex. 1.

## A. BGC and the Cantor Defendants

Nominal defendant BGC Partners, Inc. is a public Delaware corporation headquartered in New York that provides brokerage and financial services.[6] Defendant Cantor Fitzgerald, L.P., a Delaware limited partnership, is BGC's parent company and controlling stockholder.[7] Defendant CF Group Management, Inc. ("CFGM"), a New York corporation, is Cantor's managing general partner.[8]

Defendant Howard Lutnick is the Chairman and CEO of BGC.[9] Lutnick is also the sole stockholder of CFGM, through which he has sole voting control of Cantor.[10] Cantor, CFGM, and Lutnick controlled BGC at the time of the challenged transaction through their beneficial ownership of 100% of BGC's Class B super-voting common stock.[11] For purposes of this decision, Cantor, CFGM, and Lutnick are referred to as the "Cantor Defendants." Together, the Cantor Defendants hold approximately 60% of BGC's total voting power.[12]

---

[6] Am. Verified S'holder Deriv. Compl. ¶ 12 (Dkt. 25) (hereinafter "Am. Compl.").

[7] *Id.* ¶ 13.

[8] *Id.* ¶ 14.

[9] *Id.* ¶ 18.

[10] *Id.* ¶ 14.

[11] *Id.* ¶ 15.

[12] *Id.*

4

Berkeley Point, LLC is a designated underwriting and servicing lender for multi-family and commercial mortgages.[13]  Before the transaction, Berkeley Point was a wholly owned subsidiary of Cantor Commercial Real Estate Company, L.P., another Cantor affiliate.[14]  Cantor had a controlling interest in CCRE, meaning that Lutnick effectively controlled both BGC and Berkeley Point at the time of the transaction.  His personal economic interests in BGC and Berkeley Point at that time were 12.2% and 54.5%, respectively.[15]

### B.    The Special Committee

In February 2017, Lutnick informed BGC's Audit Committee that BGC was considering acquiring Berkeley Point.[16]  The Audit Committee consisted of defendant Dr. Linda Bell, defendant Stephen Curwood, defendant William Moran, and Secretary John Dalton.  Because both BGC and CCRE are affiliates of Cantor, the Audit Committee authorized its members to act as a Special Committee to evaluate and negotiate the transaction on BGC's behalf.[17]

---

[13] *Id.* ¶ 17.

[14] *Id.*

[15] Pls.' Answering Br. 13 nn.26-27.

[16] *See* Dir. Defs.' Opening Br. Ex. 29, at 1263.

[17] *Id.* at 1265.

On March 14, 2017 the Board formally established a fully empowered Special Committee of Bell, Curwood, Dalton, and Moran.[18]  Moran and Bell co-chaired the Special Committee.[19]  Lutnick supported (at a minimum) the selection of Moran as co-chair of the Special Committee.[20]  Lutnick had also "proposed that . . . Dr. Bell be named as the co-chair."[21]

Each of the four Special Committee members is an outside director who had been on BGC's Board for at least four years at the time the Special Committee was formed.  Each member is highly accomplished and respected in his or her respective field.[22]   For the directors central to this motion—Bell, Moran, and Curwood (together, the "Director Defendants")—I will briefly describe their background and ties to Lutnick.

### 1. Dr. Linda Bell

Bell is a professor of economics and has held senior roles at several prestigious universities.  She joined BGC as a director in 2013.[23]  She had previously served on the board of ELX Futures L.P., another Cantor–controlled entity, from

---

[18] Dir. Defs.' Opening Br. Ex. 30, at 1268.

[19] Pls.' Answering Br. 3.

[20] Pls.' Answering Br. Ex. 1, at 171-73.

[21] Pls.' Answering Br. Ex. 70, at 4.

[22] *See* Dir. Defs.' Opening Br. 1-2.

[23] *Id.* at 18.

6

2009 to 2013.[24]  Bell earned an average of $118,823 per year from her ELX and BGC board positions between 2010 to 2017.[25]  That compensation accounted for 7.6% of her total household income over that same period.[26]

Bell and Lutnick first met—briefly—when she was a junior faculty member at Haverford College, Lutnick's alma mater.[27]  Lutnick is a long-time member of Haverford's Board of Managers and has donated tens of millions of dollars to the college.[28]  Bell and Lutnick became better acquainted after Bell was appointed Provost of Haverford in 2007.[29]  Lutnick did not play a direct role in Bell's appointment as Provost beyond voting to approve the promotion.[30]  In her position as Provost, Bell attended meetings of and presented to the Board of Managers (including Lutnick) three or four times per year.[31]  The Provost position at Haverford did not entail significant fundraising responsibilities.[32]  In 2012, Bell left Haverford

---

[24] *Id.*

[25] Dir. Defs.' Opening Br. Ex. 16, at 3.

[26] *See id.*

[27] Dir. Defs.' Opening Br. Ex. 19, at 33-34.  Bell volunteered to host a dinner for members of Haverford's Board of Managers and Lutnick was randomly assigned as her guest.  *Id.*

[28] Pls.' Answering Br. Ex 19, at 47-48.

[29] Dir. Defs.' Opening Br. Ex. 19, at 18, 38-39.

[30] Pls.' Answering Br. Ex. 19, at 71-72.

[31] Dir. Defs.' Opening Br. Ex. 19, at 38-39.

[32] *Id.* at 29-33.

to become the Provost, Dean of Faculty, and a professor of economics at Barnard College.[33] That is her current position.

After leaving Haverford in 2012, Bell and Lutnick have had limited interactions outside of BGC. Lutnick introduced Bell to a wealthy family whose child was interested in attending Barnard.[34] On occasion, Bell has recommended students to Lutnick for interviews at Cantor.[35] Bell also mentored Lutnick's son on occasion, advising him on academic growth and finding him an appropriate tutor at Lutnick's request.[36]

### 2. Stephen Curwood

Curwood is a journalist, environmentalist, and businessperson. He is President of the World Media Foundation, Inc. and has hosted its public radio program "Living on Earth" for many years.[37] Curwood joined BGC as a director in 2009.[38] He has not served on any other Cantor-affiliated board.[39]

---

[33] *Id.* at 18-19.

[34] Pls.' Answering Br. Ex. 19, at 92-94; *see also* Pls.' Answering Br. Exs. 43-45.

[35] Dir. Defs.' Opening Br. Ex. 19, 56-58.

[36] *Id.* at 134-35, 144-148, 155-60.

[37] Dir. Defs.' Opening Br. Ex. 17, at 16.

[38] Dir. Defs.' Opening Br. Ex. 7, at 5.

[39] *Id.*

Curwood's BGC directorship earned him an average of $164,500 per year between 2010 and 2017.[40] His BGC compensation amounted to roughly 52.4% of his total household over that same time horizon.[41]

Curwood first met Lutnick when Curwood joined the Haverford Board of Managers in 2000.[42] The two served together on the Board of Managers and on various committees of the board for twelve years.[43] Their service on the institutional advancement committee pertained to "[m]oney-raising."[44] Curwood's positions at Haverford were unpaid.[45]

### 3. William Moran

Moran was previously employed by JPMorgan Chase (from 1975-2005) where he served as its General Auditor and Executive Vice President.[46] Moran joined BGC as a director in 2013.[47] He has served on the boards of three other Cantor-affiliated companies: eSpeed Inc. (BGC's predecessor, from 1999-2005),

---

[40] Dir. Defs.' Opening Br. Ex. 16, at 4.

[41] *Id.*

[42] Dir. Defs.' Opening Br. Ex. 7, 4-5.

[43] Dir. Defs.' Opening Br. Ex. 17, at 26-40.

[44] *Id.* at 39.

[45] *Id.* at 35-36.

[46] Dir. Defs.' Opening Br. Ex. 7, at 2.

[47] Dir. Defs.' Opening Br. 21.

ELX (from 2009-2013), and GFI Group, Inc. (which merged into BGC, from 2015-2016).[48]

Moran earned an average of $135,655 per year between 2013 and 2017 from his service on Cantor-affiliated boards.[49] That income represented 11.5% of his total household income over the same time frame.[50]

Moran and Lutnick's almost 20-year relationship has been largely professional.[51] They have, over that time, attended a handful of social, charitable, or political events together.[52]

## C. The Transaction

The Special Committee met 19 times after its formation and engaged in months of negotiations with the Cantor Defendants.[53] Several offers and counteroffers were exchanged.[54] On July 13, 2017, the Special Committee voted to recommend that the Board authorize the acquisition of Berkeley Point and an

---

[48] Dir. Defs.' Opening Br. Ex. 7, at 2-3, 13.

[49] Dir. Defs.' Opening Br. Ex. 16, at 6.

[50] *See id.*

[51] Dir. Defs.' Opening Br. Ex. 10, at 11-15.

[52] *Id.*

[53] Dir. Defs.' Opening Br. 2-3.

[54] *Id.* at 2-3, 38-39.

investment in CCRE's commercial mortgage-backed securities business.[55]  On July 16, 2017, the Board adopted the Special Committee's recommendation.[56]

On September 8, 2017, BGC purchased Berkeley Point from CCRE for $875 million.[57]  BGC simultaneously invested $100 million in CCRE's commercial mortgage-backed securities business in return for a 27% interest in CCRE.[58] BGC's Berkeley Point acquisition and CCRE investment are referred to as the "Transaction" in this decision.

### D.  Procedural History

Following BGC's document production pursuant to a books and records demand, the plaintiffs filed derivative actions in this court challenging the Transaction in October and November 2018.[59]  The plaintiffs' First Amended Stockholder Derivative Complaint (the operative Complaint) was filed in February 2019, naming the Cantor Defendants, Bell, Curwood, Dalton, and Moran as defendants.[60]  The plaintiffs brought a claim against the directors for breaching their fiduciary duties by improperly approving a related-party transaction.[61]  The plaintiffs

---

[55] Dir. Defs.' Opening Br. Ex. 99, at 0007.

[56] Dir. Defs.' Opening Br. Ex. 103, at 1432.

[57] Dir. Defs.' Opening Br. 39.

[58] *Id.*

[59] Dkt. 1; *see* Dkt. 6.

[60] Dkt. 25.

[61] *Id.* ¶¶ 135-38.

11

also asserted a breach of fiduciary duty claim against the Cantor Defendants as controlling stockholders of BGC and separately against Lutnick for breaching his fiduciary duties with respect to the Transaction as an officer of BGC.[62]

The defendants filed motions to dismiss pursuant to Court of Chancery Rules 23.1 and 12(b)(6) that were denied by then-Chancellor Bouchard in September 2019.[63] In denying the Rule 23.1 motion, the court found that the plaintiffs had sufficiently pleaded facts creating a reasonable doubt regarding the impartiality of a majority of the demand board. In denying the Rule 12(b)(6) motion, the court held that the plaintiffs had pleaded facts sufficient to state non-exculpated claims against Bell, Curwood, Dalton, and Moran.

After discovery, the defendants filed the motions for summary judgment at issue in this decision.[64] The plaintiffs dropped their claims against Dalton in their answering brief, leaving Bell, Curwood, and Moran as the individual Director Defendants.[65] Oral argument on the motions for summary judgment was presented on June 22, 2021. The case is scheduled for trial beginning on October 11, 2021.

---

[62] Am. Compl. ¶¶ 139-48.

[63] *See In re BGC P'rs, Inc., Deriv. Litig.*, 2019 WL 4745121 (Del. Ch. Sept. 30, 2019).

[64] Dkt. 162; Dkt. 171.

[65] Pls.' Answering Br. 2 & n.2.

## II.    LEGAL ANALYSIS

The Cantor Defendants move for summary judgment on the ground that the plaintiffs cannot established demand futility. In the alternative, they contend that the plaintiffs should bear the burden of proving at trial that the Transaction is not entirely fair.

The Director Defendants move for summary judgment on the ground that plaintiffs cannot show that they face non-exculpated claims. In particular, the Director Defendants argue that the plaintiffs have adduced no evidence that they acted in bad faith or advanced Lutnick's self-interest.

In this decision, I first decide the threshold issue of whether demand was excused. I find that genuine disputes of material fact exist regarding a majority of the BGC Board's ability to impartially consider a demand to sue Lutnick. I then analyze whether a dispute of fact remains preventing a finding that the Director Defendants do not face a claim for breaching their duty of loyalty. I find that the plaintiffs cannot establish non-exculpated claims against Bell and Curwood but that factual issues remain regarding Moran that are best left for trial.

### A.    Standard for Summary Judgment

Under Court of Chancery Rule 56, summary judgment is granted only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to

judgment as a matter of law."[66] As the moving parties, the defendants have the initial burden of "demonstrating the absence of a material factual dispute."[67] The court must view evidence "in the light most favorable to the nonmoving party."[68] At this stage in the case, the court will not weigh evidence.[69]

If the defendants meet their burden, then the plaintiffs as the non-moving party must "adduce some evidence of a dispute of material fact" to avoid summary judgment.[70] Summary judgment is "inappropriate" if a rational trier of fact could find any determinative fact in favor of the non-moving party.[71] The "existence of a scintilla of evidence in support of the [non-moving party's] position," however, "is not sufficient."[72]

---

[66] Ct. Ch. R. 56(c).

[67] *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 356 (Del. Ch. 2008) (quoting *Levy v. HLI Operating Co.*, 924 A.2d 210, 219 (Del. Ch. 2007)).

[68] *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002).

[69] *See Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1150 (Del. 2002).

[70] *Metcap Secs. LLC v. Pearl Senior Care, Inc.*, 2009 WL 513756, at *3 (Del. Ch. Feb. 27, 2009), *aff'd*, 977 A.2d 899 (Del. 2009) (TABLE).

[71] *Cerberus Int'l*, 794 A.2d at 1150; *see also Cont'l Oil Co. v. Pauley Petroleum, Inc.*, 251 A.2d 824, 826 (Del. 1969) ("When an ultimate fact to be determined is one of motive, intention or other subjective matter, summary judgment is ordinarily inappropriate.").

[72] *Haft v. Haft*, 671 A.2d 413, 419 (Del. Ch. 1995) (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986)).

**B.** **Genuine Issues of Material Fact Prevent Summary Judgment on Demand Futility.**

"The decision whether to initiate or pursue a lawsuit on behalf of the corporation is generally within the power and responsibility of the board of directors."[73] A stockholder can only pursue claims belonging to a corporation if (1) the corporation's directors wrongfully refuse a demand to authorize the corporation to bring suit; or (2) demand would have been futile because the directors were incapable of impartially considering the demand.[74]

The plaintiffs did not make a pre-suit demand on the Board and this court determined at the pleadings stage that a demand would have been futile. But the demand requirement's "ultimate consideration does not end when the complaint is found to be sufficient."[75] The demand requirement, and doctrines of demand refusal and demand excusal that may satisfy it, exist beyond the procedural requirements of Court of Chancery Rule 23.1.[76] Now, after discovery, the defendants remain "free

---

[73] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009); *see* 8 *Del. C.* § 141(a).

[74] *See Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993); *see also Stone v. Ritter*, 911 A.2d 362, 366-67 (Del. 2006).

[75] *Good v. Getty Oil Co.*, 518 A.2d 973, 974-75 (Del. Ch. 1986) ("Such resolution requires application of standards applicable to summary judgment as provided in Chancery Court Rule 56 or trial of the separate issue of demand futility under Chancery Court Rule 42(b).").

[76] *See, e.g.*, *Rales*, 634 A.2d at 932 (noting that Rule 23.1 "constitutes the procedural embodiment" of a "substantive principle of corporation law").

15

to show on summary judgment by uncontradicted facts that the allegations made are untrue and there is therefore no proper standing."[77]

Regardless of the stage of the case, the court "counts heads" of the members of a board—as composed at the time the derivative suit was filed—to determine whether a majority of its members could have impartially considered a demand.[78] The Board consisted of five directors when the Complaint was filed: Lutnick, Bell, Curwood, Moran, and non-party David Richards.[79] The defendants (unsurprisingly) do not contest Lutnick's partiality,[80] and the plaintiffs concede Richards' independence.[81] The three directors who constituted the Special Committee—Bell, Curwood, and Moran—remain at issue for the demand futility analysis.

None of Bell, Curwood, or Moran is alleged to have received a benefit from the Transaction. A personal interest is not necessary, however, to show demand futility. "A director also is disqualified from exercising judgment regarding a litigation demand if another person was interested in the alleged wrongdoing, and

---

[77] *Kahn v. Tremont Corp.*, 1992 WL 205637, at *2 n.2 (Del. Ch. Aug. 21, 1992); *see also Heineman v. Datapoint Corp.*, 1990 WL 154149, at *3 (Del. Ch. Oct. 9, 1990) (explaining that "[i]f a review of the actual facts would show that" the elements of demand futility were not satisfied, "then that may be shown in an application for summary judgment").

[78] *In re Zimmer Biomet Holdings, Inc. Deriv. Litig.*, 2021 WL 3779155, at *10 (Del. Ch. Aug. 25, 2021).

[79] Cantor Defs.' Opening Br. 6.

[80] *Id.* at 13.

[81] Pls.' Answering Br. 72 n.319.

16

the director lacks independence from that person."[82] A director "subject to the interested party's dominion or beholden to that interested party" lacks independence.[83] The plaintiffs allege that demand would have been futile because Bell, Curwood, and Moran are not independent of Lutnick, who stood on both sides of the Transaction.

To prevail, the defendants must show that, for at least two directors, there is no genuine dispute of material fact regarding their ability to make an impartial judgment about a litigation demand. This court in analyzing demand futility will consider factors that may affect a director's disinterestedness and independence in their totality.[84] Lutnick's role as a controlling stockholder is relevant. As then-Chancellor Bouchard noted in his denial of the defendants' motions to dismiss, "our law is not blind to the practical realities of serving as a director of a corporation with a controlling stockholder."[85]

---

[82] *United Food and Com. Workers Union v. Zuckerberg*, 250 A.3d 862, 887 (Del. Ch. 2020) (citing *Rales*, 634 A.2d at 936).

[83] *Del. Cty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1023 n.25 (Del. 2015).

[84] *See, e.g.*, *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 937 (Del. Ch. 2003); *Marchand v. Barnhill*, 212 A.3d 805, 818 (Del. 2019) (noting that "things other than money, such as 'love, friendship, and collegiality'" are to be considered); *Sanchez*, 124 A.3d at 1019 (Del. 2015) (explaining that a demand futility analysis considers alleged facts "in their totality and not in isolation from each other").

[85] *BGC P'rs*, 2019 WL 4745121, at *7; *see also* Leo E. Strine, Jr., *The Delaware Way: How We Do Corporate Law and Some of the New Challenges We (and Europe) Face*, 30 Del. J. Corp. L. 673, 678 (2005) (discussing that Delaware courts are "most suspicious when the fiduciary who is interested is a controlling stockholder").

I conclude that the defendants have not met their burden. I find that Bell could have independently considered a demand. But disputes of fact remain regarding Curwood and Moran's independence that prevent summary judgment on that issue. Because Lutnick, Curwood, and Moran constitute a majority of the Board, the Cantor Defendants' motion for summary judgment is denied.

### 1. Linda Bell

As described above, Bell's primary interactions with Lutnick are through her board service at BGC (and Cantor-affiliate ELX) and earlier role at Haverford College.[86] The ties between Bell and Lutnick that are raised, taken together, do not raise concerns of her partiality.

Bell's BGC-related compensation amounted to 7.6% of her household income from 2010 to 2017.[87] Her annual income from BGC, and ELX before that, averaged in the low six figures. Discovery has not revealed evidence that would lead a reasonable trier of fact to conclude that Bell would risk her reputation to protect a relatively small percentage of her household income.[88]

---

[86] *See supra* at Section I.B.1.

[87] Dir. Defs.' Opening Br. Ex. 16, at 3.

[88] *Beam v. Stewart*, 845 A.2d 1040, 1052 (Del. 2004) (explaining that plaintiffs must plead facts supporting the inference that "the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director" to survive a motion to dismiss).

Bell's Haverford associations also do not create a genuine dispute calling into question her impartiality from Lutnick. She has not been directly associated with Haverford since 2012. Lutnick's role as a major Haverford donor has had no effect on Bell's professional standing (if it ever did) in years. This case is therefore different from precedent in this court where directors with university ties were found to lack independence from significant donors.

In *Oracle*, for example, members of a special litigation committee were current, tenured professors at Stanford University who "share[d] in the benefits that come from serving at a university with a rich endowment."[89] In denying the SLC's motion to terminate a suit against defendants including a major Stanford donor, then-Vice Chancellor Strine reasoned that "[a] reasonable professor giving any thought to the matter would obviously consider the effect his decision might have" on the university's fundraising prospects.[90] Bell's circumstances are different. She was five years removed from Haverford when a demand would have been made on the BGC Board. There is no evidence from which the court can plausibly find that Lutnick's importance to Haverford would have continued to influence her discretion.[91]

---

[89] *Oracle*, 824 A.2d at 943.

[90] *Id.*

[91] *See also In re MFW S'holders Litig.*, 67 A.3d 496, 512-13 (Del. Ch. 2013) (finding connection between current tenured professor and member of Board of Visitors insufficient to create genuine issue of fact regarding professor's independence); *In re KKR Financial*

It is true that "past benefits conferred . . . may establish an obligation or debt (a sense of 'owingness') upon which a reasonable doubt as to a director's loyalty to a corporation may be premised."[92] But the record does not support a finding that Bell felt indebted to Lutnick. No facts suggest that she benefitted personally from Lutnick's donations to Haverford while she served as Provost. And, beyond her appointment to Cantor-affiliated boards, no evidence indicates that Bell received benefits from Lutnick. An appointment to a controlled board cannot, by itself, lead to a finding of partiality for demand excusal purposes. Were that the law, demand futility would be a certainty in the controlling stockholder context.[93]

The record also lacks evidence that Bell and Lutnick socialized meaningfully beyond their professional relationship. The additional facts offered to suggest a potentially deeper bond between Lutnick and Bell center around Lutnick's son. But they are hardly indicative of the sort of "emotional depth" necessary to show a lack of independence.[94] Advising a colleague's family member—or facilitating a

---

*Hldg. LLC S'holder Litig.*, 101 A.3d 980, 997-98 (Del. Ch. 2014) (dismissing the relevance of (business) relationships that ended 12 and four years prior to the derivative suit when assessing independence).

[92] *In re Ply Gem Indus., Inc. S'holders Litig.*, 2001 WL 1192206, at *1 (Del. Ch. Oct. 3, 2001).

[93] *See Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984) (emphasizing that the mere fact that a director serves on the board of a controlled company does not make that director not independent).

[94] *MFW*, 67 A.3d at 511.

mutually beneficial meeting—are not uncommon actions for the cordial among us. Even if the evidence showed that Bell went out of her way to assist Lutnick's son, it would support an inference that Lutnick may feel a sense of gratitude to her rather than the other way around.

Viewing these interactions and the other evidence in the light most favorable to the plaintiffs, I find that there are no disputes of fact sufficient to raise a genuine dispute about Bell's ability to impartially consider a demand.

### 2. Stephen Curwood

I do not reach the same conclusion about Curwood. His BGC Board compensation alone creates a genuine issue of material fact as to his independence from Lutnick. Curwood's service alongside Lutnick on the Board supplied him with more than half of his household income from 2010 to 2017.[95] The portion of his annual income attributable to BGC steadily increased from 46.9% to 64.3% between 2014 to 2017.[96]

The Cantor Defendants rely on *MFW* to argue that Curwood's BGC income alone cannot evidence a lack of independence.[97] Generally, "the existence of some

---

[95] Dir. Defs.' Opening Br. Ex. 16, at 4.

[96] *Id.*

[97] Cantor Defs.' Opening Br. 15 (citing *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014), *overruled on other grounds by Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018)).

21

financial ties between the interested party and the director, without more, is not disqualifying."[98] This court is also mindful of the public policy concerns at play when wealth is used as a factor in analyzing independence.[99] But more than "some financial ties" exist between Curwood and Lutnick. "The inquiry must be whether, applying a subjective standard, those [financial] ties were *material*, in the sense that the alleged ties could have affected the impartiality of the individual director."[100] Viewing the evidence in the light most favorable to the plaintiffs, there is a plausible inference that Curwood's director compensation was material to him.

In *MFW*, no "real evidence of [the director's] economic circumstances" was proffered and the appellants did "nothing . . . to compare the actual circumstances of the [challenged directors] to the ties [they] contend[ed] affect[ed] their impartiality."[101] Here, by contrast, it is obvious that the relevant compensation amounts to a majority of Curwood's income. Curwood described the income as "important" and "[not] a trivial amount of money."[102]

---

[98] *Kahn*, 88 A.3d at 649.

[99] *See, e.g.*, *Chester Cty. Emps.' Ret. Fund v. New Residential Inv. Corp.*, 2017 WL 4461131, at *8 (Del. Ch. Oct. 6, 2017) (explaining how factoring wealth into an independence analysis could "discourage the membership on corporate boards of people of less-than extraordinary means" (quoting *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 360 (Del. Ch. 1998) (internal quotation marks omitted))).

[100] *Kahn*, 88 A.3d at 649.

[101] *Id.*

[102] Dir. Defs.' Opening Br. Ex. 17, at 125.

More critically, Curwood's board-related income has allowed him to pursue his passions while supporting his family. Curwood testified that he "was grateful that [the director position] would allow [him] to both feed [his] family and [continue his career in] public radio."[103] It is difficult to imagine more personally motivating factors. Lutnick unilaterally possessed the power to remove Curwood's directorship and, thus, a crucial source of income—a reality that Curwood understood.[104]

The Director Defendants contend that Curwood was not dependent on his board-related income because he has "plenty of other options."[105] That may well be so and Curwood's subjective belief as such may prove determinative. But that is a matter best addressed at trial. At the summary judgment stage, a reasonable inference can be drawn that Curwood's judgment would have been clouded had he been confronted with a demand to sue Lutnick.

### 3. William Moran

Moran's almost 20-year professional relationship with Lutnick leads to the most unique analysis of the three Director Defendants. His BGC Board compensation is hardly material to him given his net worth of nearly $20 million and pension of "something short of a million dollars a year" from JPMorgan Chase.[106]

---

[103] *Id.* at 124.

[104] *Id.* at 119-21.

[105] *Id.* at 124.

[106] Dir. Defs.' Opening Br. Ex. 24, at 22; Dir. Defs.' Opening Br. Ex. 25, at 3.

There are no apparent close social or familiar ties between Moran and Lutnick. Yet a factual dispute about his ability to impartially consider a demand to sue Lutnick exists that prevents summary judgment on that issue.

Moran's respect for Lutnick is considerable. He described Lutnick as an "inspiration," worried that he might get "teary-eyed" speaking about how Lutnick is a "wonderful . . . good human being," and noted how he is "proud to be associated with a man [like Lutnick]" in his deposition.[107] This court has explained that a director's "exceptionally glowing" admiration for a controller combined with a lengthy relationship can cast "substantial doubt" on her ability to impartially consider a litigation demand against the controller.[108]

Tragically, Cantor lost hundreds of employees on 9/11. Lutnick's work supporting the families of those Cantor lost in the attacks is one source of Moran's deep respect for Lutnick.[109] The Director Defendants argue that Moran's testimony about Lutnick cannot call into question Moran's independence because it must be considered in the emotionally charged context of the 9/11 attacks.[110]

It is without question that Moran's respect for Lutnick is well placed in that regard. And it may be reasonable to infer that Moran's admiration for Lutnick did

---

[107] Dir. Defs.' Opening Br. Ex. 24, at 86, 99.

[108] *In re NantHealth, Inc. S'holder Litig.*, 2020 WL 211065, at *7 (Del. Ch. Jan. 14, 2020).

[109] *See* Dir. Defs.' Opening Br. Ex. 24, at 85-88.

[110] Dir. Defs.' Reply Br. 15-16.

nothing to sterilize his discretion. But it is also reasonable to infer that Moran's reverence for Lutnick could have colored his judgment had he been asked to press derivative claims against Lutnick. Laudable behavior in the wake of a national tragedy may well strengthen ties of loyalty. At present, the plaintiffs are entitled to the inference that favors their position.

*     *     *

Although Bell could have impartially considered a demand, I cannot conclude that no factual disputes remain regarding Curwood and Moran's independence from Lutnick. Because Curwood, Moran, and Lutnick made up a majority of the demand board, I conclude that the Cantor Defendants' motion for summary judgment on the basis of demand futility must be denied.

### C. Summary Judgment Is Granted as to Bell and Curwood but Not Moran.

The Director Defendants also ask the court to grant summary judgment because the plaintiffs cannot establish non-exculpated claims against Bell, Curwood, or Moran given the Section 102(b)(7) provision in BGC's charter.[111] Section 102(b)(7) was adopted to "free[ ] up directors to take business risks without worrying about negligence lawsuits."[112] Accordingly, as the Delaware Supreme Court

---

[111] Defs.' Mot. to Dismiss Opening Br. Ex. 1, Article VII (Dkt. 39).

[112] *Malpiede v. Townson*, 780 A.2d 1075, 1095 (Del. 2001) (discussing that Section 102(b)(7) was adopted following *Smith v. Van Gorkom* to "free directors of personal

explained in *Cornerstone*, "[w]hen the independent directors are protected by an exculpatory charter provision and the plaintiffs are unable to plead a non-exculpated claim against them, those directors are entitled to have the claims against them dismissed."[113] A plaintiff may establish a non-exculpated claim by pleading that the directors: (1) "harbored self-interest adverse to the stockholders' interests"; (2) "acted to advance the self-interest of an interested party from whom they could not be presumed to act independently"; or (3) "acted in bad faith."[114]

The parties agree that the first *Cornerstone* prong is not relevant here. None of Bell, Moran, or Curwood is accused of acting out of self-interest. As to the remaining *Cornerstone* prongs, the parties have differing views about their meaning, whether they overlap, and if they are at issue.

The plaintiffs contend that they are relying exclusively on the second prong of *Cornerstone* and disclaim any arguments that the Director Defendants acted in bad faith.[115] They argue that the Director Defendants have not met their burden of showing an absence of a factual dispute "that they were independent of, and acted

---

liability in damages for due care violations, but not duty of loyalty violations, bad faith claims and certain other conduct").

[113] *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1176 (Del. 2015).

[114] *Id.* at 1179-80; *see also id.* at 1187 n.54 ("By parity of reasoning, if after discovery, there is evidence from which a fact-finder could conclude that the independent directors breached their duty of loyalty, a trial is necessary to determine the directors' liability.").

[115] Pls.' Answering Br. 71 n.318.

independently from, Lutnick."[116]  The Director Defendants, for their part, assert that the plaintiffs have improperly collapsed the second and third prongs by "rely[ing] on the Transaction process to support an independence claim."[117]  They describe the "second—independence—prong" as focused on considerations such as personal and financial ties between directors and a controller.[118]  The Director Defendants view the second prong as entirely distinct from the third, "bad-faith prong," which they say is intended to address the deal process.[119]

The second *Cornerstone* prong, however, takes into consideration both independence and process by its very terms.  A director must have "acted to advance the self-interest of an interested party" *and* the interested party must be one "from whom [the director] could not be presumed to act independently" for the director to face a non-exculpated claim for breach of the duty of loyalty.[120]   Thus, if the director is *either* (1) shown to be independent *or* (2) shown not to have actively furthered the

---

[116] *Id.* at 96.

[117] Dir. Defs.' Reply Br. 24.

[118] *Id.*

[119] *Id.* at 24-25.

[120] *Cornerstone*, 115 A.3d at 1180; *see also In re Oracle Corp. Deriv. Litig.*, 2021 WL 2530961, at *7, *9 (Del. Ch. June 21, 2021) (describing the second prong of *Cornerstone* as itself a "two-prong test").

conflicted party's interests, dismissal is appropriate under the second prong of *Cornerstone*.[121]

The analysis of the Director Defendants' independence on the question of demand futility is therefore not determinative of whether they are entitled to dismissal from the action under *Cornerstone*. It only answers part of the question. Even if a director is found to lack independence for purposes of evaluating a demand to sue an interested party, the court must also consider whether she acted to advance the self-interest of the same interested party. A plaintiff claiming that a "control[led]" director breached her duty of loyalty must demonstrate that the director's conduct "comport[ed] with the wishes or interests of the corporation (or persons) doing the controlling."[122]

The different contexts in which Delaware courts analyze demand futility and director liability validate this distinction. A demand futility analysis is an exercise in the hypothetical. If a conflicted party—like a controller—benefits from a transaction, the court asks whether a director could theoretically have exercised

---

[121] This court has previously referred to the second prong of *Cornerstone*—in passing—as the "independence" prong. *See, e.g.*, *Morrison v. Berry*, 2019 WL 7369431, at *12 (Del. Ch. Dec. 31, 2019) ("[T]o survive the Motion to Dismiss . . . the Plaintiff must plead a non-exculpated claim, which requires sufficiently alleging the Director Defendants were either self-interested, lacked independence, or acted in bad faith." (citing *Cornerstone*, 115 A.3d at 1175-76)). But the use of "independence" as a shorthand descriptor of the second *Cornerstone* prong should not be read to nullify the two-step nature of the inquiry.

[122] *Orman v. Cullman*, 794 A.2d 5, 24 (Del. Ch. 2002) (quoting *Aronson*, 473 A.2d at 816).

28

impartial judgment if confronted with a demand to sue the conflicted party. The considerations are highly personal given the obvious reality that suing a colleague is no small matter. As the court explained in *Oracle*, a director faces greater difficulty in deciding "there is reason to believe that [a] fellow director has committed serious wrongdoing and that a derivative suit should proceed against him" than in "denying [the] fellow director the ability to proceed on a matter important to him."[123] A director's objectivity concerning a hypothetical demand could be compromised even if her actions in evaluating a transaction were beyond reproach.

The analysis of whether a director faces a claim for breaching her duty of loyalty, by contrast, requires the court to assess the director's real-world actions (or inactions) in the context of her lack of independence. If, for example, a director was the lifelong friend of a controller but acted only to advance the interests of the company and its minority stockholders (rather than the controller's self-interests) during negotiations, the director could hardly be accused of breaching her duty of loyalty. There must also be evidence (or, at the pleadings stage, well-pleaded allegations) that the director took steps in furtherance of the controller's interests to support a non-exculpated claim.

---

[123] *Oracle*, 824 A.2d at 940; *see also Marchand*, 212 A.3d at 819 (explaining that "the decision whether to sue someone is materially different and more important than the decision whether to part company with that person on a vote about corporate governance").

The third prong of *Cornerstone* asks a different question: Did the director exercise "subjective bad faith" out of a malevolent motivation to cause harm or "consciously and intentionally disregard[]" her duties?[124] There exist scenarios where a director knowingly violates the law or undertakes intentional misconduct unrelated to a desire to advance the interests of a conflicted party. In such cases, prong three applies.

Here, the plaintiffs' contentions concern aspects of the Special Committee's negotiation process that arguably furthered Lutnick's interests in a conflicted acquisition. They are focused on the second prong of *Cornerstone*. Accordingly, I must analyze whether the Director Defendants lacked independence from Lutnick and "acted to advance" Lutnick's self-interest.[125] In conducting this analysis, I must consider each of Bell, Curwood, and Moran individually.[126] "'Group pleading' will not suffice."[127] If there is evidence from which a rational fact finder could conclude

---

[124] *See In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 62-64, 65 n.104 (Del. 2006) (describing a hypothetical director as acting in bad faith when "because of subjective hostility to the corporation on whose board he serves, [he] fails to inform himself of, or to devote sufficient attention to, the matters on which he is making decisions as a fiduciary"); *Lyondell Chemical Co. v. Ryan*, 970 A.2d 235, 240 (Del. 2009) (noting that "bad faith encompasses not only an intent to harm but also intentional dereliction of duty"); *Chen v. Howard-Anderson*, 87 A.3d 648, 683-85 (Del. Ch. 2014) (discussing Delaware courts' approach to finding "bad faith").

[125] *Cornerstone*, 115 A.3d at 1180.

[126] *Id.* at 1182 ("[E]ach director has a right to be considered individually when the directors face claims for damages in a suit challenging board action.").

[127] *In re Tangoe, Inc. S'holders Litig.*, 2018 WL 6074435, at *12 (Del. Ch. Nov. 20, 2018); *see also In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *39 (Del. Ch.

that a Director Defendant breached their duty of loyalty, the matter must be resolved at trial.

### 1. Linda Bell

As explained above, there is no genuine dispute that Bell is independent of Lutnick for purposes of a litigation demand.[128] She is likewise independent for *Cornerstone* purposes. The further question of whether Bell acted to advanced Lutnick's interests is moot.[129] In any event, no genuine factual dispute about Bell's actions in negotiating or approving the Transaction is raised that could give rise to a non-exculpated claim. The Director Defendants' motion for summary judgment is granted as to Bell.

### 2. Stephen Curwood

Unlike Bell, there is a genuine dispute of material fact regarding Curwood's independence from Lutnick in the demand futility context.[130] These concerns remain relevant under *Cornerstone*.[131] But the Director Defendants have demonstrated that

---

Aug. 27, 2015) (noting that "[t]he liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director" (citation omitted)).

[128] *See supra* Section II.B.1.

[129] That is, the plaintiffs necessarily cannot show that Bell both lacks independence and advanced Lutnick's interests as they must to maintain a non-exculpated claim against her. *See supra* note 120 and accompanying text (discussing the second prong of *Cornerstone*).

[130] *See supra* Section II.B.2.

[131] To be clear, one could be independent for purposes of *Cornerstone* but not demand futility, where the more difficult question of bringing claims against a colleague is present.

there is no genuine dispute that Curwood did not undertake actions to advance Lutnick's self-interest in the Transaction.

After a review of the record, I conclude that the plaintiffs have not identified evidence to the contrary that a rational trier of fact would find determinative. A plaintiff's ability to state a duty of loyalty claim against interested fiduciaries supporting entire fairness review does not relieve the plaintiff of her "responsibility to plead a non-exculpated claim against *each director*" who seeks dismissal.[132] Under Delaware law, "that individualized consideration does not start with the assumption that each director was disloyal; rather, 'independent directors are presumed to be motivated to do their duty with fidelity.'"[133]

The evidence the plaintiffs rely on either concerns the Special Committee as a whole or (as discussed below) Moran.[134] There is nothing implicating Curwood individually. Curwood was not the Chair of the Special Committee, is not alleged to have engaged in separate discussions with Lutnick, and did not take a particularly active role in negotiations.[135] In short, there are no specific facts demonstrating the

But the facts presented in Section II.B.2 evidence a genuine dispute of material fact that bars a finding of independence under *Cornerstone*.

[132] *Cornerstone*, 115 A.3d at 1180 (emphasis added).

[133] *Id.* at 1182 (quoting *MFW*, 67 A.3d at 528).

[134] *See infra* Section II.C.3.

[135] *Compare Oracle*, 2021 WL 2530961, at *9 (finding at the pleadings stage that a director acted to advance a controller's interests where he was "the chairperson of the committee,"

existence of genuine issues for trial. The Director Defendants' motion for summary judgment is granted as to Curwood.

### 3. William Moran

Viewing the record in the light most favorable to the plaintiffs, I necessarily reach a different conclusion regarding Moran. As explained above, there is a genuine dispute of material fact regarding Moran's independence in the demand futility context.[136] There is also a genuine factual dispute about whether Moran may have acted to advance Lutnick's interests during negotiations.

Moran's understanding of Lutnick's role in the Transaction was that "[Lutnick] could negotiate for BGC with himself as Cantor."[137] Moran testified that he was mindful of Lutnick's opinion regarding the Special Committee's selection of its legal advisor.[138] Moran also ran potential financial advisors past Lutnick before one was retained by the Special Committee.[139] Certain evidence suggests that he may have viewed BGC's timetable for the transaction as at least partially driven by

---

"attended a meeting with [the counterparty] without the other two directors of the Special Committee," and "took an active role in negotiations").

[136] *See supra* Section II.B.3.

[137] Dir. Defs.' Opening Br. Ex. 24, at 160-161.

[138] *Id.* at 181-82.

[139] *Id.* at 187-193.

Lutnick.[140]  And he communicated directly with Lutnick about the deal process on several occasions.[141]

It may ultimately be that Moran engaged in hard-fought, arms-length negotiations to benefit BGC and its stockholders.  Moran's characterizations of himself as a director that stands up to Lutnick could bear out as to the negotiation of the Transaction.[142]  At this stage, however, a factual dispute remains that is best resolved at trial.

### D.    Defendants Cannot Shift the Burden of Persuasion.

Finally, the Cantor Defendants ask that the court shift the burden of persuasion under the entire fairness standard to the plaintiffs.  "When the standard of review is entire fairness, *ab initio*, director defendants can move for summary judgment on either the issue of entire fairness or the issue of burden shifting."[143]  "[I]f the record does not permit a pretrial determination that the defendants are entitled to a burden shift, the burden of persuasion will remain with the defendants throughout the trial to demonstrate entire fairness of the interested transaction."[144]

---

[140] *See* Pls.' Answering Br. Ex. 87.

[141] *See, e.g.*, Pls.' Answering Br. Ex. 84; Pls.' Answering Br. Ex. 86; Pls.' Answering Br. Ex. 123.

[142] *See* Dir. Defs.' Opening Br. Ex. 24, at 55-56.

[143] *Emerald P'rs v. Berlin (Emerald II)*, 787 A.2d 85, 98-99 (Del. 2001).

[144] *Am.'s Mining Corp. v. Theriault*, 51 A.3d 1213, 1243 (Del. 2012).

The burden of persuasion can be shifted from the defendants to the plaintiffs by "an approval of the transaction by an independent committee of directors or an informed majority of minority shareholders."[145] Here, BGC minority stockholders did not vote on the Transaction. For the burden to shift, I must therefore find that the Special Committee was independent, meaning that it "function[ed] in a manner which indicates that the controlling stockholder did not dictate the terms of the transaction and that the committee exercised real bargaining power 'at an arms-length.'"[146] "At a minimum . . . the members of the committee must be disinterested and independent."[147] Because I have found genuine issues of material fact regarding both Curwood and Moran's independence and Moran's actions in view of Lutnick's interests during negotiations, the defendants are not entitled to a pre-trial determination on burden shifting.

---

[145] *Kahn v. Lynch Commc'n Sys.*, 638 A.2d 1110, 1117 (Del. 1994).

[146] *Kahn*, 88 A.3d at 646 (quoting *Kahn*, 694 A2d at 429). Burden shifting at the summary judgment stage is uncommon. *Id.* ("[D]eciding whether an independent committee was effective in negotiating a price is a process so fact-intensive . . . that a pretrial determination of burden shifting is often impossible.").

[147] *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 25 (Del. Ch. 2014) (citing *MFW*, 67 A.3d at 509).

## III. CONCLUSION

The Cantor Defendants' motion for summary judgment is denied. The Director Defendant's motion for summary judgment is granted with respect to Bell and Curwood and denied with respect to Moran.